FILED
2020 Jul-01  PM 04:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No:2:14-CR-319-KOB-SGC |
| | ) | |
| JOSEPH HAROLD GANDY. | ) | |

**<u>MEMORANDUM OF OPINION</u>**

In the 1963 classic movie *The Pink Panther*, Inspector Jacques Clouseau clumsily chases after a notorious jewel thief "The Phantom" trying to stop him from stealing the priceless, rare diamond known as "The Pink Panther."  Yet "The Pink Panther" diamond goes missing, and "The Phantom" is one of the obvious suspects.  Inspector Clouseau is clueless that Princess Dala, the diamond's owner forced into exile, stole her *own* diamond from her *own* safe to avoid turning it over to the government.[1]

The scenario reminds the court of the jewel theft at the center of this case.

**I. BACKGROUND**

Harold Gandy admitted to staging a robbery of diamonds and other jewels from his *own* jewelry store, receiving insurance proceeds for the items allegedly stolen in the robbery, and then arranging for a few of the stolen items to be pawned at jewelry stores.  (Docs. 1 & 3 at 3-4).  But the diamonds that Gandy stole were not as large or rare as "The Pink Panther" diamond, and his motives were not quite as noble as Princess Dala's motive to keep what she believed was rightfully hers.  Instead, Gandy greedily wanted to pocket all of the insurance proceeds for all the

---

[1] Jurow, M (Producer) & Edwards, B. (Director). (1963). *The Pink Panther* [Motion Picture]. United States: United Artists.

1

"stolen" jewelry from the robbery he staged, including the proceeds for those stolen items that he held on consignment for others, and apparently keep the diamonds to later sell or pawn.

Thanks to the excellent work of investigators in this case, who bore no similarities to clumsy Inspector Clouseau, law enforcement caught Gandy after he arranged for the pawn of some of the diamonds from the staged robbery. He pled guilty to money laundering and being a felon in possession of firearms in October 2014 and agreed to forfeit his interest in cash, gemstones, and other jewelry seized by law enforcement during its investigation. (Doc. 3 at 1-2).

What to do with those forfeited jewels involves complex legal and factual twists and turns. With no objection from Gandy, this court entered a preliminary order of forfeiture extinguishing Mr. Gandy's interest in the items seized and attached a complete listing of the items forfeited to that order. (Doc. 23 & 23-1). The Government then posted notice of the forfeited items on an official government internet site for at least thirty consecutive days, beginning April 25, 2015, and ending May 24, 2015. (Doc. 33). Also, in April 2015, the Government served all known potential claimants with notice of the forfeiture, advising them of their right under 21 U.S.C. § 853(n)(2) to petition the court within thirty days for a hearing to adjudicate the validity of their legal interest in the property. (Doc. 77 at 3).

No one claimed the vast majority of items seized by the Government in this case. Only five third parties claimed some of the items listed in the preliminary order of forfeiture: Maureen A. Muecke; Lazare Kaplan International, Inc.; Levy's Fine Jewelry, Inc.; The Diamond Dealer, LLC; and XL Specialty Insurance Company. (Docs. 24-27, 29, 31, 36, 49, 50). All of the third parties except Ms. Muecke claimed ownership in diamonds that at least one other third-party also claimed. The Government does not contest the claims of any of the third parties, but only seeks

2

forfeiture of any unclaimed cash, gemstones, and jewelry.  (Doc. 77 at 4-5).  So, the court is left with a daunting task—deciding who gets what, if anything.

The government that exiled Princess Dala after her father's death claimed that it and its people owned "The Pink Panther" diamond, not Princess Dala.  Rumors swirled that the new government wanted the International Court to determine who truly owned "The Pink Panther" diamond—the government or Princess Dala.  That process sounds a bit like a third-party ancillary proceeding in a criminal forfeiture action.  Similar to the International Court in *The Pink Panther*, this court must determine the "ownership" of the stolen diamonds claimed by XL, Lazare, Levy's, and The Diamond Dealer in this third-party ancillary proceeding. Confronted with this challenge, the court hopes to do a better job than Inspector Clouseau in untangling the complicated ownership rights following Gandy's heist.

The court referred the forfeiture matter to the magistrate judge, and after discovery on the forfeiture issues, all parties, except Ms. Muecke whose claim was unopposed, filed motions for summary judgment.[2]  (Docs. 68, 69, 70, 71).  The magistrate judge filed a report and recommendation on May 10, 2018 (doc. 96), setting out in detail the undisputed facts and recommending that the court grant Lazare's motion for summary judgment (doc. 70) but deny all other motions (docs. 68, 69, 71). The magistrate judge also recommended that the court grant Meucke's (doc. 29) and Lazare's (doc. 26) petitions in full; grant in part and deny in part XL's petitions (docs. 27, 31, 36, 49); and deny Levy's (doc. 25) and The Diamond Dealer's (docs. 24, 50) petitions.

---

[2]  Because the court will dispose of this forfeiture proceeding via the parties' summary judgment motions, the court DENIES any request for an evidentiary hearing at this juncture. *See* Fed. R. Crim. P. 32.2(c) (the court can decide parties' motions for summary judgment pursuant to Fed. R. Civ. P. 56 in an ancillary proceeding under the federal criminal forfeiture statute).

The magistrate judge's report and recommendation sparked a plethora of objections. Those objections attacked the magistrate judge's legal conclusions, not her recitation of the undisputed facts in this case. So, the court ADOPTS the magistrate judge's factual findings, and discussion of the standard of review and legal framework for § 853 ancillary proceedings. (Doc. 96 at 4-13).

For clarity, the court incorporates those unchallenged portions of the magistrate judge's report and recommendation here:

## II.   STATEMENT OF FACTS

Gandy owned and operated a jewelry store in Mountain Brook, Alabama, called Denman & Crosby. (Doc. 3 at 3). On December 18, 2004, Gandy reported Denman & Crosby was robbed at gunpoint by two unidentified males and gemstones, jewelry and other items were stolen with a total value of $2.8 million. (Doc. 3 at 3-4).

### A.   Lazare's Sale and Consignment of Jewelry to Denman & Crosby

A few months before the robbery, in October 2004, Denman & Crosby contacted Lazare regarding the purchase and consignment of diamonds and jewelry owned by Lazare. (Doc. 26-1 at 6). Lazare sold a number of items to Denman & Crosby. (Doc. 27-4 at 3-7). Additionally, Lazare entered into a series of short term consignment agreements with Denman & Crosby in connection with the upcoming holiday season. (Doc. 26-1 at 7). Between October 28, 2004, and December 15, 2004, Lazare delivered to Gandy and Denman & Crosby various items on consignment, each lot with a corresponding consignment memorandum containing the customary terms and conditions and listing the items included in the delivery. (*Id*. at 7; Doc. 26-2 at 2-16). Under the agreements, receipt of the consigned jewelry was consent to the terms of the agreement and New York law controls the issue of ownership. (Doc. 26-1 at 8-9). Between October 28, 2004, and December 15, 2004, at least eleven separate consignment transactions with corresponding memoranda were executed, and over $1.1 million worth of jewelry was delivered to Gandy and Denman & Crosby during this time. (*Id*. at 7, 9). All of the Lazare jewelry was lost in the robbery. (*Id*. at 9). After the robbery, Lazare perfected its ownership in the jewelry by filing at [sic] UCC-1. (Doc. 72-1 at 2; Doc. 72-3 at 2).

4

### B.     The XL Policy

XL insured the inventory of Denman & Crosby.  (Doc. 71-2 at 2-25).
The policy included coverage for Denman & Crosby's "stock and trade
consisting of jewelry, precious and semi-precious stones, precious metals
and alloys and other stock used in your business" and "similar property of
others in the jewelry trade in your care, custody, or control."  (*Id*. at 6).
The policy had a limit of $2.6 million pursuant to an endorsement covering
"increasing stock on premises for peak season."  (Doc. 71-3 at 10).  The
limit increase specifically included the value of the Lazare stones and
jewelry. (Doc. 72-4 at 37).

### C.     The Interpleader Action

Following the robbery of Denman & Crosby, multiple claims for
insurance proceeds were asserted by parties that consigned jewelry to
Gandy and Denman & Crosby.  (Doc. 72-5 at 5-6).  After investigating the
claims, XL determined the aggregate loss exceeded the $2.6 million blanket
limit for the coverage and agreed to pay the coverage limit.  (Doc.
71-6).  As part of the $2.6 million of insurance proceeds, XL allocated
$1,100,788.09 for the loss of Lazare's jewelry.  (Doc. 71-7 at 11).  XL
contacted Denman & Crosby and asked it to consent to the payment of the
insurance proceeds directly to Lazare in the amount of its loss.  (*Id*.).
Gandy refused to sign a release and demanded all insurance proceeds, less
the deductible, be paid directly to Denman & Crosby.  (*Id*. at 11-12; Doc.
72-5 at 5).  Gandy told XL the proceeds could not be paid to Lazare
because of other lienholders but never provided XL with any information
regarding those alleged liens.  (Doc. 71-7 at 12-13).

On May 10, 2005, in response to Denman & Crosby's refusal, Lazare
filed a lawsuit against Denman & Crosby in New York.  (Doc. 71-4 at 2-
38).  Then, on May 31, 2005, XL filed an interpleader action in the
Northern District of Alabama and interpled the policy limits into the court.
(Doc. 72-5 at 2-9).  The interpleader action was ultimately settled through
a consent judgment.  (Doc. 72-11 at 2-4).  The consent judgment ordered
as follows: (1) XL received $16,600 for its legal fees and expenses; (2)
Lazare received $995,000.000; (3) Denman & Crosby received
$691,743.00; and (4) Crowning Moments, LLC received $923,300.49.
(*Id*.).  As part of the consent judgment, XL consented to the waiver of
Gandy's rights against Lazare.  (*Id*. at 4).  The case was dismissed with
prejudice.  (*Id*.).

### D.   Levy's and The Diamond Dealer

In the summer and fall of 2013, three diamonds purportedly stolen in the robbery of Denman & Crosby were presented to at least two jewelry stores in Birmingham, Alabama.  *See generally* Doc. 90-2).  It is undisputed all three diamonds were from Lazare's dealings with Gandy and Denman & Crosby.  (Doc. 27-4 at 6, 12, 19).

On July 26, 2013, Kimberly Blair Case went to Levy's and requested a loan on a 3.01 carat emerald cut diamond.  (Doc. 25 at 1).  Case represented she was the owner of the diamond.  (*Id*.).  Levy's agreed to the loan, and Case received payment of $12,000 under a pledge agreement.  (Doc. 68 at 12).  The loan had an interest rate of four percent per month.  (*Id*.).  Consistent with the pledge agreement, Case made interest payments in the amount of $480.00 on August 30, 2013, October 2, 2013, and November 12, 2013.  (Doc. 25 at 1).  Each payment extended the terms of the loan agreement by thirty days.  (*Id*.).

On August 24, 2013, Case went to The Diamond Dealer and requested a loan from William G. Bromberg, II on a 3.43 carat diamond.  (Doc. 69-1 at 2).  Bromberg agreed, and Case received payment of $8,000 on the 3.43 carat diamond pursuant to a signed loan agreement. (*Id*. at 3).  The Diamond Dealer took possession of the 3.43 carat diamond as security on the loan.  (*Id*.).  Case agreed to make monthly payments of $285.00.  (*Id*.).  On August 29, 2013, the $8,000 check cleared The Diamond Dealer's bank account and was endorsed by both Case and Gandy.  (*Id*.).  The Diamond Dealer received one payment in the amount of $285.00 on September 23, 2013.  (*Id*.).

On November 7, 2013, Case returned to The Diamond Dealer and requested a loan on a 2.16 carat diamond.  (*Id*. at 4).  Case represented she owned the diamond and it was a gift from her boyfriend.  (*Id*.).  The Diamond Dealer entered into a second loan agreement with Case and gave her $2,000, with The Diamond Dealer taking possession of the 2.16 carat diamond as security on the loan.  (*Id*.).  Case agreed the loan would come due on December 6, 2013, and the 2.16 carat diamond would become the property of The Diamond Dealer if the loan was not repaid in full by December 17, 2013.  (*Id*.).

On November 13, 2013, FBI Special Agents Chris Boyle and Mike Martin served a federal grand jury subpoena on Jared Nadler of Levy's.  (Doc. 90-2 at 8).  The subpoena commanded Levy's to provide the 3.01 carat emerald cut stone pawned by Case, as well as all supporting documentation and Nadler complied.  (*Id*.).  That same day, Special Agents Boyle and Martin served a federal grand jury subpoena on Bromberg at

The Diamond Dealer. (*Id.*). The subpoena commanded The Diamond Dealer to provide the two stones pawned by Case, as well as all supporting documentation. (*Id.* at 8-9). Bromberg surrendered the 2.16 carat diamond, along with relevant documents, but informed the agents the 3.43 carat diamond had been sent to New York for certification. (*Id.* at 9). That diamond was eventually given to the FBI on December 10, 2013. (*Id.* at 9-10).

## III.   STANDARD OF REVIEW

Ancillary forfeiture proceedings arising out of criminal cases are civil in nature and are governed by the Federal Rules of Civil Procedure. *United States v. Negron–Torres,* 876 F. Supp. 2d 1301, 1304 (M.D. Fla. 2012). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## IV.   DISCUSSION

The dispute presented is whether any of the third party petitioners can establish a valid interest in the property seized and ordered forfeited. The undersigned begins with the legal framework governing criminal forfeitures and then addresses the claims of the third parties.

7

## A.  Legal Framework

Section 853(n) of Title 21 addresses the method for adjudicating a third party's interest in seized property.  Section 853(n) provides the exclusive proceeding in which third parties may claim interests in property subject to criminal forfeiture.  *United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007).  Third parties are barred by § 853(k) from intervening in the trial or the appeal of a criminal case to assert their interests or from bringing independent suits against the United States once an indictment alleging that the property is subject to forfeiture has been filed.  *Id.*

The district court must first enter a preliminary order of forfeiture as part of the defendant's sentence, and the United States must then publish notice of the order.  21 U.S.C. § 853(n)(1).  The preliminary order may be entered without a "determination of the extent of the defendant's interest" in the property, even though a criminal forfeiture is valid only to the extent the property seized belongs to the defendant, rather than innocent parties. *See* Fed. R. Crim. P. 32.2 advisory committee's note.  The preliminary order must be entered without regard to whether a third party has a valid interest in all or part of the property because third party claims must be adjudicated in a subsequent ancillary proceeding.  Fed. R. Crim. P. 32.2(b)(2).

The ancillary proceeding is triggered when a third party asserts a legal interest in property by petitioning the court for a hearing within thirty days of the government's filing of notice. 21 U.S.C. § 853(n)(2).  The third party petition must "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." 21 U.S.C. § 853(n)(3).  The court must amend the preliminary forfeiture order if the court concludes a petitioner established

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

21 U.S.C. § 853(n)(6).  In other words, a third party claim may be raised by a person "other than the defendant" and that person can prevail only if he can demonstrate either (A) that he had a superior interest in the property to that of the defendant at the time the defendant committed the violation giving rise to the forfeiture, or (B) that after the violation, he purchased the defendant's interest in, or a superior interest in, the property and did not have reason to believe the property was subject to forfeiture when he acquired his interest.  *See United States v. BCCI Holdings, Luxembourg, S.A.*, 69 F. Supp. 2d, 36, 52 (D.D.C. 1999).

The petitioner bears the burden of proving his right, title, or interest under § 853(n)(6) by a preponderance of the evidence.  21 U.S.C. § 853(n)(3).  "Congress chose to place the burden of proof on the third-party during the ancillary proceeding, since the government would necessarily have carried its burden of proving that the defendant's interest in the property was subject to forfeiture during the criminal trial." *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001) (citation omitted).  When the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights.  *See* Fed. R. Crim. P. 32.2(c)(2).

(Doc. 96 at 4-13) (footnotes omitted).

Because this forfeiture action involves numerous parties, many forfeited items, and overlapping and complex legal objections, with a few exceptions, the court will address the objections by each party separately and rule on those objections as it discusses them. Then the court will assess which party has priority over specific items claimed if more than one party meets its burden under the federal forfeiture statute for the claimed item.

### XL's objections

The court agrees with Magistrate Judge Cornelius that "the dispute presented is whether any of the third[-]party petitioners can establish a valid interest in the property seized and forfeited."  *See* (Doc. 96 at 10).  But first things first.  Does XL have a valid, timely petition before this court that meets the requirements of § 853?  Before the court begins with XL's objections, it must address this elephant in the corner.  Lazare, Levy's, and The Diamond Dealer

all have argued at some point that XL does not have a valid petition before this court.  And the magistrate judge seemed to agree in a footnote but did not fully address the issue and granted XL's petition in part. (Doc. 96 at 14 fn 17).[3]

The Diamond Dealer in its objections (doc. 99) and Lazare in its response to XL's objections (doc. 102) claim that XL has no claim to any forfeited items because it failed to comply with the statutory requirements of 21 U.S.C. § 853(n)(3).  The Diamond Dealer points to

---

[3] The magistrate judge specifically stated:

XL filed multiple petitions in this ancillary proceeding.  First, on May 26, 2015, XL filed a notice of claim.  (Doc. 27).  This notice was filed by Natasha Fekula, a vice president and claim manager for XL Catlin.  (*Id*.).  Second, on June 26, 2015, XL, through counsel, filed a motion for hearing to adjudicate the validity of XL's interest in property subject to forfeiture.  (Doc. 31).  Third, on July 10, 2015, XL filed a supplemental submission in support of its petition.  (Doc. 36). Finally, on November 9, 2015, XL filed a completed form entitled "Petition for Remission or Mitigation of a Criminal or Civil Forfeiture Action by the United States Department of Justice."  (Doc. 49).

Because May 24, 2015, was the last day notice was posted, third parties had until June 23, 2015, to claim any of the items listed in the preliminary forfeiture order.  As such, the only timely petition filed by XL was its first notice of claim filed on May 26, 2015.  (Doc. 27).  That petition is deficient.  First, the petition was filed by an employee of XL and not counsel.  Corporate defendants must be represented by counsel. *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985). Second, and more importantly, the petition is deficient under 21 U.S.C. § 853(n).  The petition merely states XL is "looking to be compensated in the amount of $2,597,500."  (Doc. 27 at 1).  It fails to specifically identify which recovered items were those insured by XL, seeks recovery of the funds it [interpled], not recovery of the property, and does not describe XL's interest in the forfeited property.  (*Id*.).  All are required to sufficiently state a claim under 21 U.S.C. § 853(n)(3).

(Doc. 96 at 14 fn 17).

10

the magistrate judge's finding that XL's only timely petition dated May 26, 2015 is deficient because it was filed by an employee and not counsel; failed to specifically identify which recovered items were insured by XL; sought to recover the $2,597,500.00 paid under the policy and not the items themselves; and failed to describe XL's interest in the property.  (Doc. 99 at 5) (citing Doc. 96 at 14).  True, the magistrate judge did find XL's May 26, 2015 petition deficient, but she failed to address whether the subsequent amended petitions related back and were sufficient under § 853(n)(3).

In XL's opposition to The Diamond Dealer's objections (doc. 105), XL claims that its amendments to its initial timely petition cured any procedural defects and relate back to the timely-filed petition; that no party filed any objections to those amendments at the time of filing; that the court has discretion to consider the amended petitions; and that 21 U.S.C. § 853(o) permits this court to liberally construe § 853 to "effectuate its remedial purpose."  This court agrees.

The court agrees that XL's first timely petition was deficient in that counsel for XL did not file it.  But, although XL asks for the value of the insurance proceeds it paid under the insurance policy, the court notes that in XL's first, timely petition, it also attached a list of all the property insured under its insurance policy and stated that "all right, title and interest in the property transferred to XL." (Doc. 27 at 1).  Then, on June 26, 2015, XL's counsel filed its second petition; attached a list of the property for which it paid insurance proceeds; and again stated that "because XL Insurance made total loss payments on the property, all right, title and interest to the property transferred to XL Insurance, and [it] seeks to be compensated for the full amount paid out pursuant to the policy, $2,597,500.00," citing § 853(n)(1).  (Doc. 31 at 2).  And in its supplemental petition filed on July 10, 2015, XL asked for "all the forfeited assets" for

which it paid out insurance proceeds, citing 21 U.S.C. § 853.  (Doc. 36 at 2 & 9).

Although § 853 is silent as to whether a petitioner can amend beyond the thirty-day period provided in § 853(n)(2), several district courts have not only considered amended ancillary petitions but have ordered them.  *See United States v. Couch*, Crim. No. 15-0088-CG-B, 2017 WL 4105769 (M.D. Ala. 2017) (court considered an amended ancillary petition in finding that government's motion to dismiss should be granted); *United States v. Siggillito*, 938 F. Supp. 2d 877, 883 (E.D. Mo. 2013) (court directed third-party petitioner to file an amended ancillary petition); *United States v. Glenn*, 2012 WL 3775965, at *2 (E.D. Okla. 2012) (court allowed petitioner to amend ancillary petition).

The court can consider XL's amended petitions that relate back to its first timely petition and do not add additional grounds for satisfying § 853(n)(6).  *See United States v. Soreide*, 461 F.3d 1351, 1352-53 (11th Cir. 2006) (third-party petitioner claimed in initial petition only that she was a bona fide purchaser for value under § 853(n)(6)(B) and could not later argue in summary judgment that she had a superior interest under § 853(n)(6)(A));  *see also United States v. Henry*, 621 F. App'x 968, 974 (11th Cir. 2015) (the Court declined to deem the petitioner's theory untimely or improperly raised even though the initial timely § 853(n) petition omitted important supporting facts; even though the third-party petitioner changed its position in summary judgment regarding the nature of its interest in the forfeited property, he raised claims under both § 853(n)(6)(A) and (B) in his initial petition).  XL has never changed its position as to why it is entitled to the forfeited property—that when it paid out insurance proceeds for the property subject to the forfeiture, all right, title, and interest in the property passed to it.

In assessing XL's initial and amended petitions under § 853(n), the court finds that XL's petition is based on 21 U.S.C. § 853(n)(6)(A) because it argues that its interest in the diamonds

was superior to that of Gandy at the time of the acts giving rise to the forfeiture.[4] *See United States v. Chicago*, Crim. No. 15-168-CG, 2017 WL 1024276, *4 (S.D. Ala. March 16, 2017) (applying a "generous interpretation" of the petitioner's initial and amended petitions and assessing them under both §§ 853(n)(6)(A) and (B), even though the petitioner did not cite the specific subsection of § 853(n)(6) she "travels under for the basis for relief"; the "only language in either document alluding to the avenue of relief is a cursory statement in the prayer of relief" that her "right, title, or interest . . . in the property . . . is separate or superior to the interests of Chicago.").

The Government did not oppose XL's petition or amendments and has settled with XL on items forfeited but not claimed by any other third-party. All parties are clear as to the specific property XL claims in this forfeiture proceeding and have had an opportunity to argue against XL's positions.  So, the court will consider XL's petitions under § 853(n)(6)(A) as timely in deciding this matter and OVERRULES The Diamond Dealer's and any other third party's objections on this specific issue.

Now back to XL's objections.  The heart of XL's objections involves whether it has superior legal right, title, or interest to that of Gandy under § 853(n)(6)(A) in the diamond jewelry claimed by both it and other third parties: items 4, 5, 6, 7, 8, 154, 155, 172, 180, 181, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 569, and 570 in Exhibit A to the Government's Unopposed Motion for Final Order of Forfeiture (doc. 77-1).  If XL can show by a preponderance of the evidence that it has superior right, title, or interest to that of Gandy in these

---

[4] XL does not claim or argue that it is a bona fide purchaser under 21 U.S.C. § 853(n)(6)(B), and the court will not discuss that subsection regarding XL's interest in the forfeited property.

diamonds that meets the requirements of § 853(n)(6)(A), it may be entitled to the forfeited property.

XL contends that it is entitled to the specific diamonds listed above under § 853(n)(6)(A) because a constructive trust arose in its favor "at the time the government seized and forfeited" these items.  XL argues that "[i]t would be manifestly inequitable to permit [Lazare] to recover both the insurance proceeds to cover the debt owed for the consigned property and to recover the property itself."  (Doc. 71-1 at 16) (emphasis omitted).  XL also maintains that the court's imposition of the constructive trust is the appropriate remedy and would transfer ownership of the claimed diamonds and gemstones to it to prevent injustice caused by Gandy's fraud.  (*Id.* at 16-26).

The magistrate judge, citing *United States v. Shefton*, 548 F.3d 1360, 1366 (11th Cir. 2008), noted that a constructive trust can serve as a superior legal interest under § 853(n)(6)(A) and agreed that "Lazare will be unjustly enriched by the return of the property" to it for which XL had paid Lazare the insurance money. (Doc. 96 at 20).  But the magistrate found that "a forfeiture action is not the proper avenue to recover the insurance proceeds XL paid in response to the staged robbery."

The magistrate judge stated that "XL's argument focuses on its rights at the time of the seizure and forfeiture, but the issue under 21 U.S.C. [§] 853(n)(6)(A) is whether a third-party had an interest superior to Gandy *at the time Gandy committed the crimes* that led to the forfeiture order."  (Id.) (emphasis added).  Under § 853(n)(6)(A), XL must establish that it "has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in [XL] rather than [Gandy] or was superior to any right, title, or interest of [Gandy] *at the time of the*

*commission of the acts* which gave rise to the forfeiture of the property under this section[.]"
(Emphasis added).  So, the timing of Lazare's/XL's interest is key to resolution of this dispute.

The magistrate judge found that "*if* a constructive trust was formed, establishing a
superior legal interest under 21 U.S.C. § 853(n)(6)(A), it did not occur until XL interpled the
insurance funds on May 31, 2005.  Lazare's interest in the property predated the interpleader
action and is superior to any resulting constructive trust because the property belonged to it at the
time Gandy committed the underlying crime."  (Id. at 20) (emphasis added).

XL makes several objections to the magistrate judge's report and recommendation, and
the court will SUSTAIN several of those objections.

**Acts giving rise to the forfeiture**

XL claims that the magistrate judge incorrectly found that the acts giving rise to the
forfeiture action occurred in 2004 with Gandy's staged robbery of his jewelry store and claim for
insurance proceeds on those stolen items in 2005.  But XL argues that, for purposes of
§ 853(n)(6)(A), the acts giving rise to the forfeiture occurred in 2013, the date in Count One of
Gandy's money laundering activities (doc. 1), and not in 2004 when he staged the robbery or in
2005 when Gandy committed wire fraud.  Importantly, the Information does not charge Gandy
with wire fraud. So, XL argues that in 2013 when the money laundering crime occurred it had a
superior interest in the forfeited items it claims to that of Gandy under § 853(n)(6)(A) because it
had already paid out the insurance proceeds for the stolen property and Gandy, the insured/thief,
held those items in constructive trust for XL's benefit.

The magistrate judge did not specifically discuss *when* the acts giving rise to the
forfeiture occurred.  Instead, she found that Lazare's interest in the property predated any interest
that XL may have had in the property via a constructive trust.  But the magistrate judge did not

15

elaborate whether that underlying crime began in 2004 with the staged robbery; 2005 with the uncharged wire fraud; or 2013 with the acts of money laundering.

XL makes a valid point.  XL asserts that the Information "contains no mention of acts or crimes committed before 2013."  (Doc. 100 at 14).  The only date in the Information is 2013. The Information charges Gandy with money laundering that involved *only* the 3.01 diamond that Gandy criminally derived from "wire fraud" in violation of 18 U.S.C. § 1343, although it does not discuss that wire fraud in any detail. In fact, the Information does not discuss any dates surrounding the wire fraud.  (Doc. 1).

But the Binding Plea Agreement in this case states that "[o]n January 26, 2005, and March 10, 2005, Gandy submitted and caused to be submitted, by interstate wire transmissions, documents claiming that the value of items stolen during the robbery totaled approximately $2.8 million.  Among the documents submitted by Gandy was a detailed inventory of the stolen jewelry."  (Doc. 3 at 3-4).  As XL points out in its own objections, in the Binding Plea Agreement, "the staged robbery and insurance fraud establish the *factual predicate* for: 1) the property he attempted to pawn being 'criminally derived'; and 2) the defendant's 'knowingly [engaging] in a monetary transaction' in 2013."  (Doc. 11 at 14) (emphasis added).  But the Information itself does not mention any specific facts or dates of the uncharged wire fraud.

The court can find no case law in the Eleventh Circuit that gives clear insight into whether the court can look outside the Information for the date the underlying acts occurred as the "acts that gave rise to the forfeiture," where the Information cites to the wire fraud for the "criminally derived" element of money laundering; does not give the date of the wire fraud; and does not charge Gandy with wire fraud.  Remember the operative count in the information was money laundering.

The Eleventh Circuit's decision in *United States v. Kennedy* is instructive but not directly on point.  201 F.3d 1324 (11th Cir. 2000).  In *Kennedy*, the indictment specifically charged that, between April 1984 and December 1990, the defendant engaged in a scheme to defraud schools of thousands of dollars, and a jury found the defendant guilty of twelve counts of mail fraud under 18 U.S.C. § 1341 and two counts of unlawful monetary transactions under 18 U.S.C. § 1957.  And the jury also found that the defendant purchased a beach house, with his wife as a joint tenant, with money involved in a charged unlawful monetary transaction count or traceable to that crime.  So, the purchase of the beach house was directly tied to and part of a charged unlawful monetary transaction in the indictment.  *Id*. at 1325-26.

In an ancillary forfeiture proceeding in *Kennedy*, the defendant's wife claimed that she had a superior interest in the beach house to that of her husband under 21 U.S.C. § 853(n)(6)(A) because she used her own inheritance money to pay back her husband for the illegally-gotten money he used for the purchase.  But the Eleventh Circuit looked to whether she had a superior interest in the property at the time the defendant *committed the act that gave rise to the forfeiture;* the Court found the act occurred in June 1989 when the defendant used $50,000 of "ill-gotten money" as a deposit on the beach house, and *not* in April 1984 when the scheme to defraud began.  Because the defendant's wife did not start paying back the defendant until December 1989, several months *after* the defendant committed the act that gave rise to the forfeiture of the beach house, the Eleventh Circuit found that she did not have a superior interest in the property under § 853(n)(6)(A).

Likewise, in an unpublished opinion, the Eleventh Circuit in *United States v. Henry* addressed when the acts giving rise to the forfeiture began for purposes of § 853(c) that deals with the relation-back doctrine and uses similar language to § 853(n)(6)(A).  621 F. App'x 968,

975-76 (11th Cir. 2015). The government executed a search warrant on the residence of Henry, a defendant in the underlying criminal case, and seized an Audi parked in the garage that was ten feet from a bag containing 25 pounds of marijuana. *Id*. at 970. The Fourth Superseding Indictment charged Henry with a conspiracy to distribute and possess with intent to distribute controlled substances from about February 2010 to about December 15, 2010 in Count 1; possession of methamphetamine with intent to distribute on or about October 1, 2010 in Count 7; and knowingly possessing a firearm in furtherance of a drug trafficking crime in Count 8. That indictment specifically listed the Audi in the "Forfeiture Provision." (Doc. 650 in 1:10-cr-521-TCB-AJB).

Nugen Motor Sports, Inc. filed a third-party claim to the Audi in the forfeiture proceeding, arguing that it had a superior interest to Henry under § 853(n)(6)(A) because Nugen was the owner of the Audi and that Henry never acquired any right, title, or interest in it. The government argued that, under the relation-back doctrine in § 853(c), the act giving rise to the forfeiture was the beginning of the drug conspiracy in 2010. So, the government alleged that its interest in the Audi related back to 2010 when the defendant first obtained proceeds from the drug conspiracy. Because Nugen obtained any interest it had in the Audi *after* the government's interest in the Audi arose, the government argued that Nugen was not entitled to the Audi under § 853(n)(6)(A). *Id*. at 975.

In discussing the acts giving rise to the forfeiture for purposes of the relation-back doctrine, which uses language similar to that in § 853(n), the Eleventh Circuit in *Henry* stated that the "government's argument [that] its interest in the Audi vested at the start of the drug conspiracy misapplies the phrase 'upon the commission of the act giving rise to the forfeiture under this section.'" *Henry*, 621 F. App'x at 976. The Court in *Henry*, citing *Kennedy*, found

that the "acts giving rise to the forfeiture in this case were not the beginning of the drug conspiracy in February 2010 but [Henry's] payment for the Audi using ill-gotten funds."  But because the record was unclear when and if Nugen ever obtained title to the Audi, the Court in *Henry* vacated the summary judgment order and remanded the case to the district court.  *Henry*, 621 F. App'x at 976.

So, applying the reasoning from *Kennedy* and *Henry* to the facts of this present case, the court must look to the specific crimes charged in the Information and the link between the crimes charged and the forfeited items.  In *Kennedy*, the beach house was directly tied to an unlawful monetary transaction count in the indictment—so the act which gave rise to that unlawful monetary transaction began when the defendant used ill-gotten money for that transaction.  In *Henry*, the government could trace the Audi to the drug money from the drug conspiracy that began in 2010, but the act giving rise to the forfeiture of that Audi arose when Henry paid for it with drug money.

But here's the rub in this case.  The government did not charge Gandy with wire fraud that began in 2005. Instead, it charged him with money laundering in Count One and only listed *one* item that Case tried to pawn for Gandy that was stolen in the underlying staged robbery. Although the money laundering offense in Count One occurred in 2013 with the pawn of the diamond and would not have happened but for the wire fraud that made the 3.01 carat diamond "criminally derived," the Information on which the forfeiture is based fails to establish any dates of the wire fraud.

Applying *Kennedy* and *Henry* to the facts in this case, the acts giving rise to the forfeiture—the money laundering charged in the Information—took place in 2013 and no sooner. Nothing in § 853 suggests that the court can look outside the Information to find that the acts

19

giving rise to the forfeiture began *earlier* than the date of the conduct specifically alleged in the Information.  But, as in *Henry*, if the defendant used proceeds from a charged criminal activity to later purchase items that are ultimately forfeited, the court must look to the date that the defendant actually used criminally derived proceeds to obtain the forfeited property, and not the date criminal conduct began.

In this case, looking to the money laundering crime charged in the Information in Count One, Gandy took one diamond from the uncharged staged robbery and uncharged wire fraud and directed Case to pawn it in 2013.  Although Gandy *agreed* to forfeit *all* of the items involved in the staged robbery and wire fraud, the Information only charged money laundering, the crime to which Gandy pled guilty and was convicted.  *See United States v. Riggin*, 2018 WL 2183927 (D. Arizona 2018) (the relevant inquiry in a forfeiture proceeding is whether the third party has established an interest in the property "at the time of the commission of the crimes for which [the defendant] was convicted.").  So, for purposes of determining a third party's interest under § 853(n)(6)(A), the court finds that the acts that gave rise to the forfeiture in this case occurred in 2013, the date charged for the money laundering in Count One of the Information.

The court notes that, pursuant to a *plea agreement* with Gandy, the Government sought forfeiture of *all* of the jewelry stolen in the staged robbery, not just the 3.01 carat diamond specifically mentioned in Count One of the Information. (Doc. 23).  In fact, the court entered its Preliminary Order of Forfeiture that includes *all* of the stolen items from the staged robbery, not just the one diamond listed in the Information.  *Id*.  The court determined that the requisite "nexus exists" between Gandy's charged crime---his money laundering crime in 2013---and all of the jewelry involved in the staged robbery and wire fraud in 2005 that formed the factual predicate for the "criminally derived" element of the money laundering charge.  *Id*. at 2.  So,

20

even though the money laundering count only listed one diamond, and the acts giving rise to the forfeiture occurred in 2013 with the money laundering crime, all of the jewelry involved in the staged robbery was part of the preliminary forfeiture order.  But the court notes that an ancillary forfeiture proceeding should not relitigate the forfeitability of the items stolen during that staged robbery.  *See United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012) (a third-party ancillary proceeding "does not involve relitigation of the forfeitability of the property, which has already been ordered in the criminal case.") (internal quotations omitted). The only issue is XL's interest in the forfeited items at the time of the acts giving rise to the forfeiture.

And Gandy's agreement with the government to forfeit all of the items involved in the earlier staged robbery does not negate that the acts giving rise to the forfeiture for purposes of a third party's interest under § 853(n)(6)(A) occurred in 2013 with the charged money laundering. If the government had charged Gandy with wire fraud in addition to the money laundering count, the court *may* be more inclined to find the acts giving rise to the forfeiture began in 2005 with the wire fraud.  But the court cannot act on "what ifs."  The court must assess the acts giving rise to the forfeiture based on what is charged in the Information.  So, the court finds that the acts giving rise to the forfeiture occurred in 2013 with the act of money laundering as charged in the Information.

The court SUSTAINS XL's objections to the report and recommendation on this issue.

**Lazare lacks a present legal right to the property**

XL and Lazare claim ownership in the same diamonds.  But XL argues that Lazare has no present legal right to the forfeited items it claims and cannot meet the requirements of § 853(n)(6)(A).  Because Lazare relinquished any ownership rights it had in 2005 when it accepted the insurance proceeds for its stolen property in the interpleader action and released all of its

21

claims relating to the robbery, XL argues that Lazare has no present legal right to the property and had no rights in 2013 when Gandy committed money laundering.  The court agrees with XL.

Under 21 U.S.C. § 853(n), a "third party asserting an interest in forfeited property may petition the court to have [its] interest excluded from forfeiture."  *United States v. Ramunno*, 599 F.3d 1269, 1273 (11th Cir. 2010).  A third party "'seeking to challenge a forfeiture of property must first demonstrate an ownership or possessory interest in the seized property in order to have standing to contest the forfeiture.'"  *United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007) (quoting *United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 40 (1st Cir. 2003)).  Under § 853(n)(2), a third party must "assert a legal interest" in the forfeited property to claim that property in the ancillary proceeding.  21 U.S.C. § 853(n)(2).  If the third party has no legal interest in the forfeited property, it lacks statutory standing under § 853(n)(2).

Also, under § 853(n)(6)(A), Lazare as a third-party claimant must establish that it "*has* a legal right, title, or interest in the property, *and* such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest *was* . . . . superior to any right, title, or interest of [Gandy] at the time of the commission of the acts which gave rise to the forfeiture of the property under this section[.]"  *See* 21 U.S.C. §853(n)(6)(A) (emphasis added). So, Lazare may have a qualifying interest under §853(n)(6)(A) if it shows that "(1) [it has] a legal interest in the forfeited property; (2) [its] legal interest in the forfeited property was superior to [the defendant's] interest; and (3) [its] legal interest was superior to [the defendant's] interest at the time of [the acts which gave rise to the forfeiture of the property]."  *See Ramunno*, 599 F.3d at 1273.

Evaluating § 853(n)(6)(A) in conjunction with the requirement in § 853(n)(2) that the

third party assert its legal interest in the forfeited property, the "has" in § 853(n)(6)(A) logically indicates a *present* legal right, title, or interest in the forfeited property claimed in the third-party petition. If a third party had legal right, title, or interest in the forfeited property at some point but sold or gave up its right, title, or interest before the ancillary forfeiture proceeding, necessarily the third party would have no right to claim in a forfeiture proceeding property in which it no longer has any right, title, or interest. So, because Lazare gave up its right, title, or interest in the forfeited property and no longer *has* a present legal right, title, or interest in the forfeited property it claims in its petition, it cannot have a qualifying interest under § 853(n)(6)(A).

Under New York UCC §§ 9-102(a)(20) and 9-103(d), Lazare obtained a purchase money security interest in consigned items it sent to Gandy between October 28 and December 15, 2004. After the robbery took place on December 18, 2004, Lazare perfected its interest in the consigned items by filing a financing statement under UCC-1 on May 9, 2005.[5] But, if Lazare relinquished or forfeited its ownership interest in the consigned items before 2013 when the acts giving rise to the forfeiture occurred, it cannot satisfy § 853(n)(6)(A) because it "has" no present legal interest in that property.

On May 31, 2005, Gandy's insurer XL filed an interpleader action in the Northern District of Alabama and interpled its policy limits into the court. (Doc. 71-4 at 2-38). XL allocated $1,100,788.09 for the loss of Lazare's consigned jewelry, but Lazare agreed to accept $995,000.00 to satisfy its loss under the consignment agreement with Gandy. (Doc. 72-11). The

---

[5] New York UCC § 9-515 provides that a financing statement "is effective for a period of five years after the date of filing." So, Lazare's financing statement lapsed in 2010 and the record contains no evidence of Lazare filing any continuation of the financing statement as provided in § 9-515(c).

consent judgment ordered that the $995,000.00 "shall be paid in *full satisfaction* and discharge of any claims against any past or present party to this action. . . ."  (Id. at 2-3) (emphasis added). Lazare executed its release on April 5, 2005, which released and discharged Gandy from any "claims and demands whatsoever" that Lazare had or could have in the future "in specific reference to an armed robbery which occurred on December 18, 2004."  (Doc. 78-2).   So, in essence, the $995,000 replaced the jewelry that Lazare owned that was involved in the robbery, and Lazare agreed to that amount as full satisfaction of the debt that Gandy owed to Lazare.

XL argues that "it would be wholly inequitable to determine, as a matter of Alabama law, [that Lazare] holds a present ownership interest in the forfeited property" when it received $995,000.00 for that property in full satisfaction of any debt Gandy owed to Lazare.  This court agrees.

The general rule of law in Alabama is that the "payment to the owner of property wrongfully taken from him of a judgment in his favor for its value is given the effect of a purchase of property by the defendant in the judgment."  *Crescent News & Hotel co. v. Hines*, 61 So. 9, 10 (Ala. Civ. App. 1913).  Although not directly dealing with insurance payments, this general rule could apply to the situation in this case.  XL's payment to Lazare under the consent judgment in the interpleader action for Lazare's property wrongfully taken during the robbery in effect transferred ownership from Lazare to XL.  XL in essence purchased the property via its insurance payment to Lazare.

Lazare argued in the interpleader action that its stolen merchandise constituted "covered property" under the Jeweler's Block Coverage Form and thus it had the "status of a loss payee or co-insured under the Jeweler's Block Coverage." (Docs. 71-9 at 4-5 & 71-10 at 3-4).  So, when Lazare received the $995,000.00 as part of the consent judgment and released its claims against

Gandy in the interpleader action, Lazare relinquished *ownership* of all the items it had on consignment with Gandy in exchange for $995,000.00 as full satisfaction for the debt Gandy and his insurer XL owed to it.  (Doc. 71-10 at 3-4).

The consignment agreements between Lazare and Gandy put the risk of loss of the consigned jewelry on Gandy until he "paid for or returned" the items to Lazare and required Gandy to insure the consigned goods.  (Doc. 26 at 6).  The insurance proceeds that Lazare received in the interpleader action "paid" Lazare as an insured for the loss of its consigned property and replaced its ownership (i.e., its right, title, and interest) in the stolen jewelry.

And Lazare knew that receiving insurance proceeds for the stolen property transferred its right, title, and interest in the property to XL.  In fact, Lazare also received $80,706.11 from its own insurer Fine Art, Jewelry & Specie Willis Limited in full and final satisfaction of its claim under that policy.  (Doc. 78-3).  But in May 2015, Lazare negotiated a deal with its insurer in which Fine Art would return "all right, title, and interest" in the insured property to Lazare to enable Lazare to recover the items forfeited by Gandy.  (Doc. 78-4).  Lazare and its insurer agreed to a 75/25 split of any recovery up to the $80,706.11, and Lazare would bear the cost of the third-party ancillary proceeding.  Lazare went to all of this effort, as The Diamond Dealer put it, to "resurrect any right, title, or interest" that Lazare had before it accepted insurance proceeds in full satisfaction of the debt Gandy and XL owed to it.  (Doc. 78 at 6).

So, when that jewelry resurfaced years after the interpleader action, and at the time of Lazare's petition in this ancillary proceeding, the forfeited property no longer belonged to

25

Lazare.[6]  Thus, Lazare has no present legal interest in that property as required by § 853(n)(6)(A) and is not entitled to any of the forfeited property it claims.  The court SUSTAINS XL's objection on this issue.

**XL is entitled to a constructive trust under Alabama law**

XL argues that it has a superior interest to that of Gandy for purposes of § 853(n)(6)(A) as the beneficiary of a constructive trust. When it interpled the insurance proceeds into the court and paid out insurance proceeds to Lazare under the insurance policy, XL argues a constructive trust arose as a result of Gandy's fraud and to prevent unjust enrichment that would occur if Lazare were allowed to keep the insurance proceeds *and* receive the diamonds in this forfeiture action.

*Constructive trust and 21 U.S.C. § 853(n)(6)(A)*

So, does XL have a constructive trust under Alabama law that would give it a superior interest to that of Gandy under 21 U.S.C. § 853(n)(6)(A)?   Whether XL is entitled to a constructive trust is a matter of Alabama state law.  But Federal law determines whether that interest is a "legal interest" under § 853(n)(6)(A) and whether that interest was superior to Gandy's interest at the time he committed the acts that gave rise to the forfeiture in 2013.  *See United States v. Ramunno*, 599 F.3d 1269, 1273-74 (11th Cir. 2010).

Under Alabama law, a constructive trust is a "creation of equity that operates to prevent unjust enrichment."  *Hanner v. Metro Bank and Protective Life Ins*., 952 So. 2d 1056, 1070 (Ala.

---

[6] Interestingly, XL caught wind of a criminal investigation in this case in 2005 and asked the magistrate judge in the interpleader action to allow it to amend its complaint and then stay the proceedings pending the criminal investigation. The judge refused and stated that "[i]f some or all of the jewelry is eventually recovered, then [XL] will be reimbursed for some or all of the money [interpled] into this court."  (Docs. 33 & 46 in 2:05-cv-1107-RRA).

2006), overruled on other grounds by *Nettles v. Rumberger, Kirk & Caldwell, P.C.*, 276 So. 3d 663 (Ala. 2018). Under Alabama law, a constructive trust is imposed when property is wrongfully acquired by "fraud, or where, in the absence of fraud, it would be inequitable to allow the property to be retained by the person who holds it." *Hanner*, 952 So. 2d at 1070 (citations omitted). A constructive trust "arises when the underlying equities exist," not when the court announces the constructive trust. *United States v. Shefton*, 548 F.3d 1360, 1365 (11th Cir. 2008).

Gandy fraudulently claimed the property covered under the insurance policy was stolen in a robbery he staged; XL paid the insurance proceeds into the interpleader action; and XL paid Lazare its loss caused by Gandy. And returning that recovered stolen property to Lazare or any of the recipients of those insurance proceeds now would unjustly enrich them. So, the court agrees with XL and the magistrate judge that Lazare would be unjustly enriched if it receives, in essence, double recovery for its loss—if it gets to keep the amount it agreed would satisfy in full Gandy and XL's obligations to it and then turn around and obtain the consigned items for which the debt had already been satisfied.

A general principle in equity is that a party should not receive double recovery for a single loss. *McClendon v. City of Boaz*, 395 So. 2d 21, 26 (Ala.) (a party is entitled to only one satisfaction of his injuries). So, under Alabama law, a constructive trust would be an appropriate avenue to prevent Lazare's double recovery at XL's expense and avoid unjust enrichment in this case. But the analysis does not end here.

The court now turns to federal law to determine if XL's equitable interest meets the requirements of § 853(n)(6)(A), and if so, whether that interest was superior to Gandy's interest at the time he committed the acts giving rise to the forfeiture.

27

As the magistrate judge correctly noted, the Eleventh Circuit in *United States v. Shefton*, applying Georgia law on constructive trusts, held that "a constructive trust can serve as a superior legal interest under section 853(n)(6)(A) and thus can serve as grounds for invalidating a criminal forfeiture." *Shefton*, 548 F.3d at 1366. XL's constructive trust under Alabama law arose at the latest when XL interpled the money on May 31, 2005 with payment of insurance proceeds for the stolen jewelry, and so existed at the time of the acts giving rise to the forfeiture in 2013. The court finds that XL's constructive trust interest satisfies § 853(n)(6)(A) and gives it a superior interest to that of Gandy at the time of the acts giving rise to the forfeiture in 2013 as charged in the money laundering count.[7]

So, because Lazare accepted insurance in full satisfaction of its claim against Gandy and relinquished its interest in the diamonds, it has no present interest in any of the forfeited items it claims, and XL has a constructive trust interest under § 853(n)(6)(A) for the items it claims. Now, the court turns to the claims of Levy's and The Diamond Dealer, who both claim some of the same diamonds as XL. The court must first assess whether Levy's and The Diamond Dealer have an interest under § 853(n)(6), and, if so, whether that interest has priority over XL's constructive trust interest.

**Levy's Objections**

The only item claimed by Levy's is the 3.10 carat emerald cut diamond listed as item 4 in

---

[7] The court OVERRULES all of XL's objections regarding subrogation The magistrate judge correctly rejected XL's subrogation and surety arguments. The court can find no evidence in the record of contractual subrogation rights of XL that would allow it to stand in the shoes of *Lazare*. And, under Alabama law, "'[n]o right of subrogation exists where the wrongdoer is also an insured under the same policy.'" *Moring v. State Farm Mutual Automobile Ins.*, 426 So. 2d 810, 812 (Ala. 1983) (quoting 44 Am. Jur. 2d, Insurance, § 1794 (1982)). So, XL has no right of subrogation when its insured Gandy was the wrongdoer.

Exhibit A to the Government's Unopposed Motion for Final Order of Forfeiture.  (Doc. 77-1 at 6).[8]

Levy's objects to the magistrate judge's finding that it was not a bona fide purchaser of that diamond under Alabama law and to her failure to "resolve any conflict between Levy's and [Lazare] and/or XL" because of that finding.  (Doc. 101).

To say Levy's interest is confusing is an understatement.  Not even Levy's seems to know the nature of its interest.  Levy's suggests in its objections that it changed its characterization of its interest in the 3.01 carat emerald cut diamond at issue.  Initially, Levy's says it characterized its interest as a "collateralized loan," but now argues that it was a pawn transaction that created a lien in the pledged goods under the Alabama Pawnshop Act, Ala. Code § 5-19A-1, and the Alabama Uniform Commercial Code, Ala. Code § 7-1-101.  (Doc. 101 at 4). Levy's claims that its pawnshop lien in the pledged goods gave it a "special property interest" that makes it a bona fide purchaser for value under the forfeiture statute and entitles it to the 3.01 carat emerald cut diamond at issue.

Although Levy's acknowledged that it may have changed its characterization of the loans, it in fact *initially* argued in its motion for summary judgment that it was a *secured* creditor that took possession of the diamond; it provided an affidavit of Todd Denaburg that referenced a "loan in [a] pawn transaction" and included a copy of the Alabama Pawnshop Act, Ala. Code § 5-19A-5.  (Doc. 68 at 5, 10-14).  Lazare claims in its response to Levy's objections that Levy's never claimed it was a secured creditor (doc. 103 at 5), but that statement is incorrect.  To complicate matters further, Levy's now claims in its objections that it does not have a "secured

---

[8]   Lazare and XL also claim an interest in this diamond, but, as discussed above, Lazare has no present legal interest in that diamond.

interest" but instead has a "special property interest" pursuant to its lien under the Alabama Pawnshop Act. The court is unclear exactly what Levy's means by a "special property interest," or why it denounced its claim that it had a "security interest." But Levy's did in fact have a secured lien in the pledged goods that can be an "interest" in the property for purposes of  § 853(n)(6)(B).

Based on what Levy's argued in its motion for summary judgment (doc. 68), the court agrees with Levy's that it is a bona fide purchaser under 21 U.S.C. § 853(n)(6)(B).  For property to be shielded from forfeiture under 21 U.S.C. § 853(n)(6)(B), a third party must be "a bona fide purchaser for value of the right, title, *or interest* in the property and [was] at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section." (Emphasis added).  Federal law decides what interests are subject to forfeiture under § 853(n)(6)(B), but state law determines the *nature* of a claimant's interest in the forfeited property. *United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008); *United States v. Kennedy*, 201 F.3d 1324, 1334 (11th Cir. 2000).

First, under Alabama law, the court must decide the nature of Levy's interest in the forfeited diamond it claims.  Under the Alabama Pawnshop Act, a pawnshop lien attaches to "pledged goods pawned for the money advanced and the pawnshop charge owed." Ala. Code § 5-19A-10(a). The record reflects by a preponderance of the evidence that the Levy's transaction involved a pawn transaction via a pawn ticket.  (Doc. 68).

Under Alabama law, Case had no obligation to repay the sum she borrowed from Levy's on Gandy's behalf.  *See* Ala. Code § 5-19A-7 ("A pledgor shall have no obligation to repay any sum to the pledgee.").  But Case did make three $480.00 payments on August 30, October 2, and

30

November 12, 2013, each payment extending the maturity deadline for thirty days.  (Doc. 68 at 2).

On the expiration of the last redemption period, which would have been December 12, 2013—thirty days after the November 12, 2013 extension—complete title would have passed to Levy's if Case did not redeem the diamond by that deadline.  *See* Ala. Code § 5-19A-6 ("Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker.").  But the FBI took possession of the diamond on or around November 13, 2013, well before Case's deadline to redeem the diamond.  (Doc. 68 at 2-3).

Regardless of whether the redemption period remained open when the FBI took possession of the goods, Levy's did have a secured lien on the diamond in its possession even before the redemption period ended.  *See* Ala. Code § 5-19A-10.  ("A pawnbroker shall have a lien on the pledge goods pawned for the money advanced and the pawnshop charged owed.").  So, Levy's interest in the diamond was that of a secured lienholder.

And, under federal law, a valid secured creditor or lienholder can be a bona fide purchaser for value under § 853(n)(6)(B). *See United States v. Carmichael*, 433 F. Supp. 2d 1259, 1260–61 (M.D. Ala. 2006) (holding that secured creditors and lienholders can be purchasers for value under subsection (n)(6)(B)) (citing *United States v. Watkins*, 320 F.3d 1279 (11th Cir. 2003)).  The Eleventh Circuit in *Watkins* faced the issue of whether an *unsecured or general creditor* could be a bona fide purchaser within the meaning of § 853(n)(6)(B) and found that an *unsecured* creditor could *not* be a bona fide purchaser under the criminal forfeiture statute. The Circuit Court reasoned that, "[u]nlike secured creditors, general creditors cannot point to any one specific asset and claim that they are entitled to payment out of the value of that

31

specific asset" under the federal criminal forfeiture statute.  *Watkins*, 320 F.3d at 1283.  Judge Myron Thompson in *Carmichael* expounded on the holding in *Watkins* and held that "from this logic [in *Watkins*] could follow the principle that parties with an interest in specific property–that is, secured creditors, including lienholders—may properly be considered purchasers for value under subsection (n)(6)(B)."  The court agrees with that logic.

And no party argues that Levy's had any cause to believe the property was subject to criminal forfeiture.  So Levy's, as the holder of a secured pawnshop lien, would be a bona fide purchaser for value under § 853(n)(6)(B) and the court SUSTAINS its objection on this issue.

The court acknowledges that § 853(n)(6)(B) protects a subsequent purchaser of "'*the defendant's interest*' in an asset." *United States v. Soreide*, 461 F.3d 1351, 1356 (11th Cir. 2006) (quoting *United States v. Kennedy*, 201 F.3d 1324, 1330 (11th Cir. 2000) (emphasis in original)); *see also United States v. Reckmeyer*, 836 F.2d 200, 208 (4th Cir. 1987) (interpreting the statute to reach "persons who [gave] value *to the defendant* in a transaction with the expectation that they would receive equivalent value in return.").  The record reflects that Case represented herself as the "owner" of the diamond, but she worked as Gandy's agent and at his specific direction in the transactions with Levy's and The Diamond Dealer.  (Doc. 3).  Therefore, the court considers these transactions to involve Gandy's interest in the forfeited items.

After the court addresses The Diamond Dealer's objections below, which are similar to those of Levy's, the court will discuss why Levy's interest in this specific diamond has priority over XL's constructive trust interest.

### Diamond Dealer's Objections

The Diamond Dealer alleges that it has an interest in two forfeited items: a 2.16 carat diamond listed as item 5 in Exhibit A to the Government's Unopposed Motion for Final Order of

Forfeiture and a 3.43 carat diamond listed as item 558 in that motion.  (Doc. 77 -1 at 6, 76).[9]

Like Levy's, The Diamond Dealer objects to the magistrate judge's finding that it was not a bona fide purchaser under Alabama law.  The Diamond Dealer claims that it had a perfected security interest under Alabama law in the diamonds at issue, giving it a protected interest under 21 U.S.C. § 853(n)(6)(B) as a bona fide purchaser.  (Docs. 69 & 99).  This court agrees.

The record shows by a preponderance of the evidence that The Diamond Dealer gave value in return for a perfected security interest in the diamonds that it took into its possession as collateral on the loans.  On August 24, 2013, The Diamond Dealer agreed to loan Case $8,000.00 and took possession of the 3.43 carat diamond as security on the loan.  Case agreed to make monthly payments of $285.00.  On August 29, 2013, the $8,000 check cleared The Diamond Dealer's bank account and both Case and Gandy had endorsed the check.  The Diamond Dealer received one payment in the amount of $285.00 on September 23, 2013.  (Doc. 69-1 at 2).

On November 7, 2013, The Diamond Dealer loaned Case $2,000 and took possession of the 2.16 carat diamond as security on the loan.  Case agreed the loan would come due on December 6, 2013, and the 2.16 carat diamond would become the property of The Diamond Dealer if the loan was not repaid in full by December 17, 2013.  (*Id.*).

Under Alabama law, a "security interest" is an "interest in personal property" that "secures payment or performance of an obligation."  Ala. Code § 7-1-201(35).  And a secured party may perfect its security interest by "taking possession of the collateral."  Ala. Code § 7-9A-

---

[9] Lazare also claims an interest in the 2.16 carat diamond, but not the 3.43 carat diamond. As the court explained previously, Lazare has no present legal interest in the 2.16 carat diamond because it was part of Lazare's insurance claim for which it was fully satisfied.  XL claims an interest in both the 2.16 and 3.43 carat diamonds under its constructive trust.

313(a).

As discussed above regarding Levy's interest, under federal law, a valid secured creditor or lienholder can be a bona fide purchaser for value under § 853(n)(6)(B). And no party argues that The Diamond Dealer had any cause to believe the property was subject to criminal forfeiture.  So, the court agrees that The Diamond Dealer, as the holder of a perfected security interest, is a bona fide purchaser of both diamonds under 21 U.S.C. § 853(n)(6)(B) and will SUSTAIN its objections on this issue.

*The 2.16 carat diamond*:  Because the court has already determined that Lazare has no present interest in any of the forfeited property, XL is the only other third party with a  remaining claim to this diamond.  The court will discuss below why The Diamond Dealer's interest in this diamond has priority over XL's interest.

*The 3.43 carat diamond:*  The Diamond Dealer argues that the magistrate judge's findings on this diamond are unclear and claims that the magistrate judge seems to say that Lazare is entitled to this diamond.  The court disagrees.  The magistrate judge's report is clear that Lazare *sold* this diamond to Gandy prior to the staged robbery.  (Doc. 96 at 8 fn 7).  Lazare does not claim any interest in this 3.43 carat diamond because it sold this diamond to Gandy prior to the robbery.  (Doc. 104 at 11).  The only claimants to this diamond are The Diamond Dealer and XL.  So, the court OVERRULES any objection on this issue.

**Levy's v. XL and The Diamond Dealer v. XL**

So, having determined that both Levy's and The Diamond Dealer are bona fide purchasers for value under § 853(n)(6)(B), how does that finding affect XL's constructive trust interest under § 853(n)(6)(A)?  Whose interest has priority?

The statute at issue, 21 U.S.C. § 853, does not answer this question or give any guidance

34

to the court regarding which interest takes priority. And the court can find no binding or persuasive case law that addresses priority between a third-party claimant under § 853(n)(6)(A) (XL's equitable constructive trust interest) and one under § 853 (n)(6)(B) (Levy's and The Diamond Dealer's bona fide purchaser interests). So, the court will return to Alabama's law on constructive trusts to help it decide who has a priority interest.

The court determined XL's constructive trust interest by applying Alabama law. Under Alabama law, the constructive trust will follow "property [of the trust] into the hands of a transferee *other than a bona fide purchaser for value*." *Knowles v. Canant*, 51 So. 2d 355, 358 (Ala. 1951) (emphasis added). So, XL's constructive trust interest under § 853(n)(6)(A) would trump any transferee of the property subject to the trust EXCEPT to a bona fide purchaser for value with no knowledge of any previous wrongdoing. The court has already determined that both Levy's and The Diamond Dealer qualify as bona fide purchasers for value under § 853(n)(6)(B). So, the court finds that Levy's and The Diamond Dealer's interests take priority over XL's constructive trust interest.

The court has carefully reviewed and considered *de novo* all the materials in the court file, including the report and recommendation and all third parties' objections. As explained in this opinion, the court ADOPTS the magistrate judge's findings of fact, standard of review, and legal framework for § 853 ancillary proceedings (doc. 96 at 4-13) but rejects the findings and recommendation.

The court finds that Meucke's ancillary petition should be GRANTED (doc. 29) because she is entitled to the Cartier watch; Lazare's motion for summary judgment (doc. 70) and ancillary petition (doc. 26) should be DENIED; Levy's motion for summary judgment (doc. 68) and ancillary petition (doc. 25) should be GRANTED because it is entitled to the 3.10 carat

diamond listed as item 4 in doc. 77-1 at 6; The Diamond Dealer's motion for summary judgment (doc. 69) and ancillary petitions (docs. 24, 50) should be GRANTED because it is entitled to the 2.16 carat and 3.43 carat diamonds listed as items 5 and 558 in doc. 77-1 at 6, 76; and XL's motion for summary judgment (doc. 71) and ancillary petitions (docs. 27, 31, 36, 49) should be DENIED as to the diamonds listed as items 4, 5, and 558 claimed by Levy's and The Diamond Dealer and GRANTED as to the diamonds listed as items 6, 7, 8, 154, 155, 172, 180, 181, 559, 560, 561, 562, 563, 564, 565, 566, 567, 569, and 570 in doc. 71-1.

The court will order the government to submit a new Motion for Final Order of Forfeiture within 45 days, with a draft final order of forfeiture that reflects the prevailing parties for each item in conformity with this Memorandum Opinion.

The court will enter a separate Order in conformity with this Memorandum Opinion.

DONE and ORDERED this 1st day of July, 2020.


**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE